# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**UNITED STATES OF AMERICA**

vs.                                                              CASE NO: 8:20-CR-39-T-35-CPT

**RODOLFO R. CASTILLO RODRIGUEZ**
_____/

## SENTENCING MEMORANDUM

The Defendant, Rodolfo R. Castillo Rodriguez (hereinafter "Mr. Castillo Rodriguez"), by and through his undersigned counsel, respectfully submits this sentencing memorandum for this Honorable Court's consideration. Mr. Castillo Rodriguez requests that this Court consider and determine that a variance from the applicable guideline range is appropriate under 18 U.S.C. § 3553, and thus impose a sentence of a total of 84 months of incarceration.

## STATEMENT OF FACTS

*Procedural History*

1. Mr. Castillo Rodriguez pled guilty to count one of his indictment for Conspiracy to Possess with the Intent to Distribute Five Kilograms or More of Cocaine, While on Board a Vessel Subject to the Jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a)(1), 70506(a) and (b), and 21 USC § 960(b)(1)(B)(ii).

2. This case is presently set for sentencing on October 29, 2020.

*Advisory Guideline Calculation*

3. The Presentence Report (PSR) calculates Mr. Castillo Rodriguez's total offense level as a level 33 with a criminal history category of I. PSR at ¶¶ 26; 31. Accordingly, Mr. Castillo Rodriguez faces an advisory guideline sentencing range of

135 to 168 months of incarceration.  PSR at ¶ 51.

## MEMORANDUM OF LAW

This memorandum examines the issue of whether a sentencing range of 135 to 168 months is in fact sufficient but not greater than necessary to comply with sentencing directives laid out in 18 U.S.C. § 3553(a)(2), or if a 84 month sentence, 50 months below the low end of the recommended guideline would be just as effective.  An examination of section 3553 is critical in the instant case since many of its sentencing factors supports Mr. Castillo Rodriguez's request for a variance. *See* 18 U.S.C. § 3553(a).

### I. <u>Booker and its Progeny Provides the Court with the Discretion to Impose a Variance under 18 U.S.C. § 3553(a)</u>

Pursuant to *United States v. Booker,* 543 U.S. 220, 245-67 (2005), a court is now unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting *Koon v. United States,* 518 U.S. 81 (1996)).[1]

To guide a court's discretion, section 3553(a)(2), requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of several factors.  Against this backdrop of factors, Mr. Castillo

---

[1] As the Supreme Court recently reaffirmed, [s]entencing courts have long enjoyed discretion in the sort of information they may consider when setting an appropriate sentence. This durable tradition remains, even as federal laws have required sentencing courts to evaluate certain factors when exercising their discretion." *Dean v. United States*, 127 S. Ct. 1170, 1175 (2017) (internal citation omitted).  Moreover, judicial discretion to consider all information about the case and the offender is a time-honored principle of American law and has historically been understood as a means of ensuring justice in individual cases. *See Koon v. United States*, 518 U.S. 81,113 (1996) *accord Pepper v. United States*, 562 U.S. 476, 487-88 (2011).  Congress has expressly affirmed a judge's discretion to consider the fullest information possible. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Rodriguez respectfully submits that a variance is warranted in his case. As the following sections demonstrate, an advisory guideline sentence would violate the requirement that a defendant's sentence be sufficient but not greater than necessary to satisfy the purposes of § 3553(a). *See Pepper v. United States*, 562 U.S. 476 (2011) (a "sentencing judge's overarching duty under § 3553(a) [is to] to impose a sentence sufficient, but not greater than necessary"). As this memorandum establishes, applying the § 3553(a) factors to Mr. Castillo Rodriguez's case supports the imposition of an 84-month sentence.

1. **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.**

The significance of the first factor lies in its comprehension that a court cannot merely focus on a defendant's crime in determining his sentence. Rather, a court must consider the offense against the backdrop of a defendant's life. The Supreme Court has emphasized "[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Pepper v. United States*, 562 U.S. 476, 488 (2011) (citation omitted). Consistent with this perspective, one federal jurist has concluded:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics' of the defendant.

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-514 (S.D.N.Y. 2006) (Rakoff, J.).

*The History and Characteristics of the Defendant*

The tenet in *Adelson* that a defendant's criminal conduct must be measured against his overall life has resonance in the instant case. The Adelson Court contemplated a balance of an individual's misgivings versus their good will. While Mr. Castillo Rodriguez was paroled into the United States for committing a drug trafficking crime, this conduct, on paper, is a break from an otherwise law-abiding life. In any case where the defendant is from a foreign country, where ready access to criminal records may not accessible, there may always be a question as to whether the individual has led a lawful life. It is at least implicit through Mr. Castillo Rodriguez's work history and his family's station in life, that he has been a law-abiding individual prior to the instant conduct.

Mr. Castillo Rodriguez is a 35-year-old Ecuadorian man, who by all accounts had a terrible upbringing in an environment where he was not wanted by his caregiver. Mr. Castillo Rodriguez's parents separated when he was only three or four years old. As he was the youngest of twelve siblings, his mother ushered him off to live with his older sister Marisol, while his mother pursued a new love interest. While Mr. Castillo Rodriguez loved Marisol and looked to her as a quasi-mother figure, his feelings, by all practical appearances, were not reciprocated. Forced to grow up with Marisol's own children of a similar age, Mr. Castillo Rodriguez was mistreated to the point of physical abuse at the hands of his adult sister. The mistreatment was further evident in that he did not enjoy the same privileges as her children, was not treated as an equal, and it was abundantly clear that he simply was not wanted. In the time since childhood Mr. Castillo Rodriguez has cultivated a meaningful relationship with his mother and other siblings,

however during his presentence interview, recalling his childhood with Marisol as his caregiver brought him to tears.

As an adult Mr. Castillo Rodriguez has predominantly worked in a lawful capacity, either as a fisherman or as a bricklayer.  Like many in Ecuador he has lived in poverty his entire life, barely earning enough to put food on the table.  Mr. Castillo Rodriguez is unmarried; however, he has been in a thirteen-year relationship with his significant other, Mayra Pico Mierles (hereinafter "Ms. Mierles").  Together they are raising two sons, one thirteen years old and the other eleven.  Both boys are in school.

Mr. Castillo Rodriguez lives with Ms. Mierles, their sons, and his mother in law.  Considering a lack of meaningful income, Mr. Castillo Rodriguez intended on using a portion of the projected proceeds from this voyage to improve their home, provide medical treatment to wife, and finally medical treatment for his mother who suffers from an undiagnosed condition that inhibits her ability to walk.

Respectfully, his impoverished status, legitimate employment, and unmet necessities for he and his family are implicit evidence that he is not a full-time drug trafficker or an individual with proprietary ties to a drug organization.

*Nature and Circumstances of the Offense*

Mr. Castillo Rodriguez, along with four others, were caught in International Waters of the Eastern Pacific Ocean by the United States Coast Guard Cutter MUNRO, after an aerial drone detected the movement of the defendant mariners.  MUNRO interdicted the defendants' vessel and detained it after elusive movement.  Once boarded, the vessel turned up 29 bales of contraband, yielding a net weight of 782 kilograms of cocaine.  Mr. Castillo Rodriguez is not known to be the captain, navigator, or load guard

of the vessel, and maintained a role as a common mariner with some driving and mechanical responsibility.

Despite Mr. Castillo Rodriguez's failures in the instant case, he has never been an individual motivated by greed or avarice. Rather, his criminal and reported work history reflects a man who believes in an honest day's work for an honest day's pay. His conduct in this case is a break from this notion, however, after years of seeing his family suffer and go without, he succumbed to this illegality. Circumstances are never an excuse to commit a crime, nor does Mr. Castillo Rodriguez assert the underlying current of his decision as such. However, the reason for the decision should be considered and respectfully, in this case it does mitigate Mr. Castillo Rodriguez's blameworthiness. Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (Feb. 2005)(stating that while a defendant's blameworthiness should be considered according to the nature and seriousness of the crime, it can also be assessed according to "the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or diminished capacity"); *see also United States v. Genao*, 831 F.Supp. 246, 254 (S.D.N.Y.1993)("Can we really say we have a rational system of justice when the court, in imposing sentence, is stripped of the power to even consider the socio-economic and educational background of the defendant"). *Griffin v. Illinois*, 351 U.S. 12, 23 (1956) (Frankfurter, J., concurring) ("The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread.") (citing Anatole France as quoted in Cournos, A Modern Plutarch (1928), p. 27).

Despite the foregoing mitigation, Mr. Castillo Rodriguez is remorseful for his conduct. He acknowledges and accepts responsibility for making a poor decision in a time of great weakness. A decision breaking from a good history. Returning to contention that the first § 3553 factor requires a sentencing court to view a defendant's crime through the lens of her entire life, Mr. Castillo Rodriguez's case establishes the wisdom of such a perspective. For the essential question present, is whether Mr. Castillo Rodriguez's crime reflects his true nature, or whether it is a result of a tragic circumstance that thrust him into making a decision he will never forgive himself for, regardless of the endeavor's success. When the totality of Mr. Castillo Rodriguez's life is considered, it seems that his criminal behavior is precipitated from two of life's necessities; shelter and medical care. Thus, if *Adelson's* admonition that courts should consider a defendant's overall existence in imposing his sentence has any meaning, the undersigned respectfully submits a variance is warranted in Mr. Castillo Rodriguez's case.

2. **THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW AND PROVIDE JUST PUNISHMENT**

Mr. Castillo Rodriguez is charged with a drug offense that guidelines him out at a total offense level 33, calling for an incarceration sentence between 135 and 168 months. Mr. Castillo Rodriguez is not blind to the harm caused by the illegal narcotics he was transporting, both on an individual end user, but also those innocent bystanders victimized by those ruthless souls who *are* driven by greed and who show no concern for mankind. This is understood by him, having sat in jail during this pandemic, for

approximately eight months at the time of this memorandum's drafting. While at the time of his undertaking his role in this conspiracy he was cognizant of the horrors of the drug trade, he struggled to think clearly as he watched his mother's and wife's health decline and his family yearn for appropriate shelter.

      The overriding struggle in any criminal court is striking the balance in sentencing to impact a person and hopefully deter that person from ever making such a criminal decision again. To that end, there is also the question of whether the person can actually be impacted. Some will not change no matter the sentence. Others will never recidivate regardless of sentence. Many are at risk of committing further offenses but can be deterred with the correct sentencing measures imposed.

      Mr. Castillo Rodriguez likely will never see his mother again. His wife's health will not improve without the means to obtain medication, thus putting her life at risk. This is his true punishment. This is the result of his decision to act. For these reasons, amongst others to be articulated at sentencing, it is counsel's submission that Mr. Castillo Rodriguez will not recidivate, regardless of sentence imposed. Certainly, this Honorable Court must impose a reasonable sentence, however the man being sentenced has a 35-year history of hard work, appreciation for doing the right thing, and diligence in caring for his family. He is not a career criminal, nor is he one who has made his livelihood from criminal activity. Respectfully, Mr. Castillo Rodriguez's conduct throughout his life exhibit that he does respect the law, and as such, a harsh punishment is not necessary in his case.

      It would be reasonable for this Court to consider the economic climate to which Mr. Castillo Rodriguez will one day return, as an older man. It would be reasonable for

this Court to consider that anyone in those circumstances might again succumb to the idea of making more money in a week than they could in months doing anything else. The back and forth on this issue versus the goodness of a person and their ability to resist such a decision could rock on forever. The reality is that for those living in these conditions, anytime they want they could likely gain access to a drug boat crew and take a chance. Mr. Castillo Rodriguez has lived in Ecuador his entire life and has done his best to lawfully provide for his family. He has broken his back his entire adult life working for pennies, just to survive, with no articulable reward aside from existence. He is not a weak-minded man, nor is he a criminal. He is not the sum of this, his worst deed. He was a man desperate to comfort his mother, the love of his life, and to provide for those he loves so dearly. He was a man trying to do what society has instructed men to do for centuries, regardless of country. He was trying to provide. His folly was attempting to do so running a fool's errand for which he will regret in perpetuity.

Mr. Castillo Rodriguez is before this Court because of his own poor choice. However, this choice was born of necessity rather than evil. Because of this, Mr. Castillo Rodriguez respectfully submits that a sentence below the recommended guideline is appropriate.

 3. **THE NEED TO AFFORD ADEQUATE DETERRENCE TO CRIMINAL CONDUCT**

The principle of general deterrence is based on the unsupported premise that lengthy prison sentences deter crime. This faulty conception has resulted in the mass incarceration of individuals in the United States.

> For the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period, than any

> other democracy. In fact, with 5 percent of the world's population, the U.S. is home to 25 percent of its prisoners. There are five times as many people incarcerated today than there were in 1970. . . [The] archipelago of prisons and jails costs more than $80 billion annually — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder et al., *What Caused the Crime Decline?*, Brennan Center for Just., 22-23 (Feb. 12, 2015), *available at* https://www.brennancenter. org/publication/what-caused-crime-decline.

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom?"*, 59 Crime & Delinquency 1006, 1031-33 (2013).  Kleck and Barnes' study concludes:

> there is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.

*Id*. at 1031. The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014).  In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. *See id*.; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963) ("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes").

## 4. TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT

Having established that prison sentences, regardless of length, have no impact on general deterrence, this section demonstrates that the § 3553(a) factor of specific deterrence also supports Mr. Castillo Rodriguez's request for a variance. This section focuses on studies establishing that incarceration has no effect on recidivism.

*The relationship between incarceration and recidivism*

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections, *Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016). As the following discussion establishes, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

A 2016 study conducted by the National Institute of Corrections (NIC) establishes three critical tenets regarding incarceration and specific deterrence. First, incarceration has a negligible impact on crime prevention. *See also* Vera Instit. of Justice, *Overview of The Prison Paradox: More Incarceration Will Not Make Us Safer* (July 2017)(concluding that research shows a "weak relationship between incarceration and crime reduction, and highlights proven strategies for improving public safety that are more effective and less expensive than incarceration").[2] Instead, a longer prison sentence

---

[2] The United States Sentencing Commission has determined that "[t]here is no correlation between recidivism and guidelines' offense level. . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." *See* U.S. Sent'g Comm'n,

may actually lead to a greater risk of recidivism. *See id*. There is strong evidence that prison - by disrupting education and employment, reducing prospects for future employment, weakening family ties, and exposing less serious offenders to older more serious offenders- leads to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007).

Moreover, harsh penalties do not improve the long-term outcomes of the offender. Longstanding research has found that imprisonment brings about negative individual-level changes that can harm re-integration upon release. National Research Council. *The Growth of Incarceration in the United States: Exploring Causes and Consequences,* (Nat'l Acad. Press 2014), available at. https://doi.org/10.17226/1861; *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887). ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance").

Finally, the 2016 study concludes that community correction programs are more effective than incarceration in reducing recidivism. *See* R. S. Frase et al, *Criminal History Enhancements Sourcebook* (2015) (discussing studies establishing the crime that "custody is associated with higher rates of re-offending than community sentences."). Thus, the most effective way to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections.

---

*Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (May 2004).

While Mr. Castillo Rodriguez will be deported back to Ecuador upon his release, these studies in sociology and criminology span continental borders. Human nature is human nature, regardless of native country. The numbers do not show a benefit to longer incarceration, and given Mr. Castillo Rodriguez's situation, a short sentence would allow him to return home and again try to provide for his family in a legitimate fashion. In absence of a deterrent effect, Mr. Castillo Rodriguez submits that a sentence of 84 months is sufficient, but not greater than necessary to comply with the provisions of § 3553.

5. **TO PROVIDE THE DEFENDANT WITH NEEDED EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER**

Given that Mr. Castillo Rodriguez is from a country whose economy is poor, learning a skill could be critical in his ability to earn a better living for he and his family upon his release from prison. He has expressed an interest in learning English while incarcerated to expand his ability to communicate with others and possibly increase his value to employers. He has also expressed a desire to educate himself in the fields of auto repair and mechanics and sewing.

*The Kinds of Sentences Available*

Because Mr. Castillo Rodriguez is charged with a Class A felony, he is not eligible for probation per statute.

*The Kinds of Sentences and Guidelines Range Established*

As noted earlier, Mr. Castillo Rodriguez's guidelines call for a sentence between 135-168 months' imprisonment. In spite of Mr. Castillo Rodriguez now having the

ability to enjoy a sentence of less than the statutory minimum mandatory of 120 months due to the passage of the First Step Act and its effect on statutory Safety Valve, Mr. Castillo Rodriguez still submits that even a 135 month sentence is overly harsh given his circumstances. Moreover, the pre-sentence report's calculated sentence of 135 to 168 months of imprisonment is predicated on drug guidelines that a majority of federal judges believe are too harsh. Indeed, "73.7 percent of district court judges and 82.7 percent of circuit court judges [rate] drug punishments as greater than appropriate to reflect the seriousness of drug trafficking offenses." (*See* USSC, *Fifteen Years of Guideline Sentencing, An Assessment of How Well the Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 52.

Respectfully, based upon the foregoing, Mr. Castillo Rodriguez submits that the requested sentence of 84 months' imprisonment is sufficient but not greater than necessary to satisfy the objectives of § 3553.

***The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct***

Because of the recurring and essential problems with the sentencing guidelines, drug sentences necessarily reflect widespread judicial disagreement with the guidelines. For example, in fiscal year 2014, sentences below the guideline range were imposed in over 60% of all drug cases, including departures that were government sponsored. (*See* U.S. Sent'g Comm'n, *2014 Sourcebook of Federal Sentencing Statistics*, tbl. 27).

Considering the types of sentences that have been imposed on drug cases, Mr. Castillo Rodriguez submits that an 84-month prison sentence is not antagonistic to the concept of disparity.

## CONCLUSION

As the foregoing establishes, the unique and unthinkable circumstances presented in Mr. Castillo Rodriguez's case warrant a variance below the applicable guideline range. Because the decision in *Booker* has made the Guidelines advisory and the parsimony clause of 18 U.S.C. § 3553(a) the paramount consideration, Mr. Castillo Rodriguez respectfully submits that a variance is appropriate pursuant to this significant and paramount sentencing statute.

Respectfully submitted this 2nd day of October, 2020.

/S/ Jason M. Mayberry
Mayberry Law Firm, LLC
Jason M. Mayberry
FL Bar# 36212
Attorney for Defendant
3630 W. Kennedy Blvd.
Tampa, FL 33609
Ph- 813.444.7435
Fx- 727.755.0098
jason@mayberryfirm.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by Electronic Filing Service to the Office of the United States Attorney, this 2nd day of October, 2020.

/S/ Jason M. Mayberry
Jason M. Mayberry